UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

| | | |
|---|---|---|
| GABRIEL D. HAWKINS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 3:12-cv-1354-HLA-TEM |
| | ) | |
| | ) | |
| | ) | |
| CITY OF LAKE CITY, FLORIDA, and | ) | |
| JASON M. GOLUB, individually, | ) | |
| | ) | |
| Defendants. | ) | |

## Rebuttal Expert Report of John J. Ryan

1. My name is John Ryan. I have been actively involved in police practices and law enforcement since 1981. I was an active police officer for twenty years. In the final year of my active career and since my retirement in June of 2002 from police services, I have been involved in police and law enforcement practices as a private consultant regarding law enforcement issues.

2. My education includes a Bachelor of Science Degree in the Administration of Justice from Roger Williams University in Bristol, Rhode Island; a Master of Science Degree in the Administration of Justice from Salve Regina University in Newport, Rhode Island and; a Juris Doctor Degree from Suffolk University Law School.

3. From 1993 until 2002 I served as an adjunct faculty member in the graduate Administration of Justice Program at Salve Regina University in Newport, Rhode Island. In that capacity I was responsible for graduate courses on

1

Constitutional Issues in Law Enforcement; Police Misconduct/Civil Liability; Managing Police Organizations; Contemporary Issues in the Justice Field; Juvenile Justice; Mental Health Law and; Business Crime.

4. Since 2000, I have written several manuals for use by police officers. Two of these manuals are extensively used by Rhode Island Law Enforcement agencies. These manuals are: Rhode Island Law Enforcement Officers' Guide to Criminal Procedure, 2000, and Rhode Island Law Enforcement Officers' Bill of Rights, A Guide to Investigations and Hearings, 2000. The other manuals are nationally distributed by the Public Agency Training Council as materials used in conjunction with training programs for public employees. These manuals are: Legal and Liability Issues in the Public Schools, 2001; Policy Development for Public Safety Agencies, 2002, Civil Liability and Risk Management for Law Enforcement Agencies, 2003, Use of Force, 2004, Administrative Investigations In Law Enforcement Agencies, 2004, Legal and Liability Issues for Hostage Negotiators, 2005, Public Safety Media Relations (Manual and Guide) 2005, Arrest Search and Seizure, 2005, and Law and Best Practices for Successful Police Operations, 12 High Risk Critical Tasks That Impact Law Enforcement Operations and Create Exposure to Liability Litigation 2007, 2010 and 2013 editions, Legal and Liability Risk Management Manual Guide-The Law and Best Practices of Successful Jail/corrections Operations 2009.

5. I also author an annual publication for law enforcement officers titled, Case Law for Critical Tasks in Law Enforcement. This field guide provides officers with a legal update on critical tasks such as search, seizure, use of force, pursuit,

investigations and interrogations. This guide has been adopted by agencies around the United States for use by law enforcement personnel.

6. I am currently the co-director of the Legal and Liability Risk Management Institute along with James Alsup, G. Patrick Gallagher and Lou Reiter. In that capacity I author and edit the institute's legal update service for law enforcement. This update service and an archive of all articles that I have written can be found at www.patc.com.

7. As part of the Legal and Liability Risk Management Institute I also conduct policy, training and operations reviews for law enforcement agencies and jails throughout the United States. These reviews focus on the manner in which agencies treat the critical tasks in law enforcement and jail operations. As part of these reviews I assist agencies in identifying areas in policy, training and operations that may be improved upon to bring the agency within the legal mandates and generally accepted practices in law enforcement and jail operations.

8. Since 1993, I have conducted numerous training sessions for public employees. Participants in this training have included law enforcement officials, school officials, attorneys and judges. I have provided training in the following areas:

   a. Policy development for public safety agencies.

   b. Legal Issues in police use of force.

   c. Legal Issues in internal affairs investigations.

   d. Police misconduct/civil liability.

   e. Legal/Liability Issues in Narcotics Operations.

    f.  Arrest, Search and Seizure, & Interrogation.

    g.  Racial profiling.

    h.  Legal issues in public schools.

    i.  Media relations for public safety agencies.

    j.  Constitutional update for law enforcement officers.

    k.  Basic training for detectives.

    l.  Law enforcement officers' bill of rights/due process in administrative investigations.

    m.  Legal/policy and decision making factors in law enforcement pursuits including use of force/intervention tactics.

    n.  Legal and policy Issues for hostage negotiators.

    o.  Legal and liability issues for SWAT operations

    p.  Legal and liability issues for jails

    q.  High Risk Critical Tasks/Best Practices in Law Enforcement Operations.

9.  I am a former police Captain of the Providence Police Department in Providence, Rhode Island where I served for twenty years before retiring in 2002. During my tenure as a police officer I served in the following capacities: patrol officer in both the Patrol Division and the Tactical Unit; a detective in the Detective Bureau; a sergeant in the Patrol Division; a lieutenant in the Patrol Division; Director of Training; Director of the Department's Office of Public Affairs and; Director of the Department's Administrative Staff. During most of my career I also took an active role in researching and authoring department policy.

4

10. Since my retirement in June of 2002 I have taught numerous courses on police policy and procedure, arrest, search and seizure, use of force, police pursuits, civil liability for law enforcement agencies and specialized courses for narcotics officers, SWAT commanders, and internal affairs officers. Participants in these courses have come from thousands of law enforcement agencies around the United States. Officers in attendance have come from departments with under ten sworn officers and departments with sworn officers numbering in the thousands. These programs are conducted numerous times annually throughout the United States.

11. The course on policy and procedure focuses on critical tasks in law enforcement and includes, inter alia, policy issues relating to use of force; police pursuits; domestic violence; sexual harassment and external sexual misconduct; off-duty conduct; hiring & retention issues; internal affairs; supervisory practices; search and seizure; property and evidence; care, custody and transport of prisoners as well as training issues relating to critical tasks in law enforcement.

12. The program on High Risk Critical Tasks/Best Practices in Law Enforcement includes instruction on Use of Force including inter alia: dealing with individuals of diminished capacity i.e. emotionally disturbed, mentally impaired; and suicidal, excited delirium, and use of electronic control devices; Search-Seizure and Arrest; Pursuit and Emergency Vehicle Operation; Care, Custody, Control, and Restraint of Prisoners; Domestic Violence; Off-Duty Conduct; Sexual Harassment, Discrimination, and Misconduct; Selection and Hiring; Internal Affairs; Special Operations; and Property and Evidence.

13. As a co-director of the Legal & Liability Risk Management Institute I regularly research and draft policies for law enforcement agencies and jails relating to high-risk critical tasks including use of force, arrest-search & seizure, pursuit, emergency vehicle operation, special operations, internal affairs, hiring and selection-retention of officers, care-custody-control & restraint of prisoners, sexual harassment-discrimination & sexual misconduct, domestic violence, and dealing with the mentally ill.

14. In 2002, I was a featured speaker at the national conference for the International Association of Law Enforcement Planners, which was held in Long Beach, California.

15. In 2002, I was a featured speaker at the National Internal Affairs Investigators Association conference, which was held in Tampa, Florida.

16. In 2004, I was a featured speaker at the Rhode Island Bar Association's Annual Meeting, speaking on Constitutional Issues related to Law Enforcement practices.

17. In 2005, I was a featured speaker at the National Sheriffs' Association Annual Conference, held in Louisville, Kentucky, where I presented training for legal advisors on Internal Affairs and Employee Discipline.

18. In 2005, I was a featured speaker at the annual national conference for Public Risk Managers (PRIMA) in Milwaukee where I conducted training for risk managers and attorneys representing police departments. One of the trainings involved use of force while the second covered the high liability areas in law

enforcement operations to include arrest, warrants, and other issues involving search and seizure, as well as police pursuits.

19. I have been a featured speaker annually, to include the 2011 session, of Georgetown Law Center's annual §1983 Civil Rights Litigation program. I have regularly presented materials related to law enforcement policy, training and supervisory practices as well as use of force. In 2009 I presented materials for two sessions one of which was on the use of TASER and one which was a panel discussion on strip searches. I have been published annually in materials from Georgetown Law Center related to this program. The 2011 session was focused on reviewing current law enforcement practices and civil liability related to TASER.

20. In November of 2005, I was a featured speaker at the annual National Conference of the National Leagues of Cities & Towns in Seattle, Washington speaking on Contemporary Liability Risks for Law Enforcement Agencies.

21. In October of 2006, I was a featured speaker at the annual conference of National Internal Affairs Investigators' Association in Gatlinburg, Tennessee.

22. I have also provided lectures for attorneys on civil rights litigations relating to law enforcement operations, including a November of 2006 presentation for the Georgia Bar Association's ICLE program.

23. In 2007 I was a featured speaker at the annual conference for the International Municipal Lawyers Association.

24. In 2007, 2008, 2009, 2012 and 2013 was a featured speaker at the Practising Law Institute's Annual Section 1983 Civil Rights Litigation program. My 2007

presentation in this program resulted in a law review article in the Touro Law Review (Volume 24, Number 3, pages 569-600) "Recent Developments in the Use of Excessive Force by Law Enforcement" Karen Blum/Jack Ryan.  It is noted that my materials have been included in their annual publication related to this program.

25. In 2008 I was a featured speaker at the annual conference for the Association of American Law Schools, Civil Rights section, where I presented material on law enforcement policy, training, and generally accepted practices in pursuits and use of force.

26. In 2009 I was a featured speaker for the national conference for public risk managers.

27. In 2009 I conducted executive level training on law enforcement pursuit operations for the Utah Highway Patrol.

28. In 2009 I was certified with TASER by the Muncie Indiana Police Department by a TASER certified instructor.

29. In 2009, I was a featured speaker at the Annual Kentucky Tactical Officers' Association Conference where I lectured on high risk tasks in tactical operations including high risk entries.

30. In 2009 I was the featured speaker at the Alabama Attorney General's annual "Law Enforcement Summit" where I lectured on high risk critical tasks in law enforcement to include use of force, pursuit, arrest, search and care, custody and control of prisoners.

31. In 2010, I was a featured speaker that the annual national conference for PRIMA where I presented a law enforcement risk management program titled: "Promoting Professionalism while Reducing Liability; The Impact of Policy, Training, and Supervision and Auditing Strategies."

32. In 2010, I was a featured speaker at the National Internal Affairs Investigators Association annual conference held in Indianapolis, Indiana where I lectured on Bias Free Law Enforcement/Profiling.

33. In 2010, I was a featured speaker at the annual conference of the National Council of County Association Executives, where I spoke on law enforcement liability and strategies to reduce liability by increasing professionalism.

34. In 2012 I developed a training program for law enforcement and attorneys dealing with use of force; electronic control devices; and sudden custody death. This program which I am presenting throughout the United States is accompanied by a text manual which I wrote and is also being distributed nationwide.

35. In 2012, I was a featured speaker at the National Internal Affairs Investigators Association Annual Conference where I spoke on Use of Force and Sudden In-Custody Death.

36. In 2012 I was a featured speaker at the Texas Commission of Law Enforcement Officers Standards and Education where I presented to law enforcement trainers from throughout the State of Texas on training liability and the need for training in the high risk critical tasks in law enforcement.

37. In 2013, I was a featured speaker and panel member in a program titled "Policing in Trying Times" at Suffolk University Law School in Boston Massachusetts.

38. Since 2002 I have been involved in the auditing of law enforcement operations throughout the United States conducting several audits annually based on either a need or as a proactive measure of agency performance in the high liability areas of the road and jail operation.

39. My experience, training and background are more fully described in the attached curriculum vitae which I incorporate by reference to this report.

40. I have reviewed the following materials to date regarding this case:

    a.  Complaint
    b.  1st Amended Complaint
    c.  2nd Amended Complaint
    d.  Documents Responsive to Plaintiff's Request for Production
        1.  Documents Re: Hawkins
        2.  Golub Personnel File
        3.  Video
    e.  Deposition of Joason (Jason) Golub
    f.  Deposition of Patrick Ross
    g.  Deposition of Chief Argatha Gilmore
    h.  Deposition of Gabriel Hawkins
    i.  Exhibits Hawkins Depo.
    j.  Police DVD (Video/Audio)
    k.  Plaintiff's Expert Disclosure (Edmonds)

41. This expert report is based upon the materials provided to this date. The opinions presented in this report are based upon my specialized experience, training and knowledge of police practices as well as my continued research and work with law enforcement nationally. This work includes conducting training for law enforcement around the United States as well as auditing the policies and operations of law enforcement agencies around the United States. My

opinions are provided with a reasonable degree of certainty within the fields of law enforcement, police activity and police administration and supervision. I am familiar with police civil litigation and know the normal phases of discovery. With this in mind I recognize that there may be additional documentation as the case progresses. In the event that additional material is produced I shall be prepared to supplement this report.

42. At the outset it is important to note that this report is based upon the facts as presented by the material and specifically avoids drawing conclusions based upon credibility issues of the parties.

43. The law enforcement event reviewed in this report involved the stop and arrest of Gabriel Hawkins by Officer Jason Golub who was an officer of the City of Lake City, Florida Police Department.

44. According to the arrest affidavit filed by Officer Golub, he observed Gabriel (Gabriell in some of reports) operating a Chevy Impala at approximately 5:50 a.m. on May 2, 2010. (Arrest Aff.). Officer Golub attested to various driving conduct which justified a stop of the vehicle including: driving at 5 mph; stopping at green light at Main Blvd. and Duval St. and sitting for approximately 1 minute; after proceeding through the light driving at 5 mph again; making several "abrupt" lane changes "using his turn signal for no apparent reason"; upon approaching the intersection of NW Hilton Ave. the vehicle stopped for approximately 2 seconds and then "abruptly" took off at 5 mph on US 90; upon reaching the green light at Baya Dr. and US 90 the vehicle stopped at the green light for approximately 2 minutes before proceeding through it; the car then

stopped in the left hand lane of US90 in front of Mikells Power Equipment for no apparent reason; and then the vehicle did a U-turn pulling into the coin operated laundry. (Arrest Aff.).

45. At the outset of his deposition, in response to a question regarding his memory of the events with Mr. Hawkins, Officer Golub testified: "This was three years ago. If I'm going to testify, it's going to be off my report." (Golub Depo. P. 8).

46. In deposition testimony, Officer Golub, reviewing his report, asserted that his reasons for stopping Hawkins included: "Impeding traffic, driving below the posted speed limit, careless driving, abrupt lane change. There were several." (Golub Depo. P. 8). Golub stated he would not testify at deposition that Mr. Hawkins impeded other traffic without looking at his video. (Golub Depo. P. 8).

47. Golub acknowledged calling the stop out as a "suspicious vehicle" instead of calling out a motor vehicle violations based stop explaining: "There is times where it takes longer to call in a traffic stop on the radio, so there is times that when you stop a vehicle and it's not going the way you want it to go, you let dispatch know that you're out with a vehicle, where you're at, and you just label it as a suspicious vehicle just so you can get where you're at and the vehicle description and tag number out so it's logged." (Golub Depo. P. 10). It is noted that this explanation is inconsistent with all accepted practices which would be that officers should provide an accurate reason for the stop both for officer safety purposes as well as documentation. In such a case it would take no more time to say "motor vehicle violation" than it would to say "suspicious vehicle." Golub testified that his suspicions were aroused based on Hawkins abruptly

12

turning into the business as well as his previous U-turn though he acknowledged that his suspicion was somewhat dispelled when he verified that Hawkins worked at the business. (Golub Depo. P. 11-12).

48. Officer Golub further attested in the affidavit that when he pulled in behind the vehicle with his lights activated, the driver got out of the vehicle and "almost fell over." (Arrest Aff.).   Although this report specifically avoids making credibility determinations a review of the video from Officer Golub's patrol vehicle shows no such near fall by Mr. Hawkins. (Video).   Officer Golub testified that the camera may not pick up Hawkins almost falling over because the camera is two dimensional while officers see in three dimensions. (Golub Depo. P. 13).   It is noted that the camera viewpoint is direct and there is no instability depicted on the part of Mr. Hawkins.   In fact, a review of the video shows that Mr. Hawkins got out of his vehicle without putting his hands on the door of the vehicle or any other part of the vehicle to stabilize or assist him in getting out of the car. (Video).   Additionally, when told to sit back in the car he did so without using his arms or hands for support. (Video).   Throughout the field sobriety testing, Mr. Hawkins is left standing by himself, totally unsupported with no signs of instability. (Video).

49. It is noted that Officer Ross testified that his experience with the mobile video recorders in Lake City, was that when the camera was activated there would be a two-minute backup of video, thus two minutes prior to activation would be captured. (Ross Depo. P. 9).   Ross acknowledged the importance of the two minute back up for purposes of catching driving behavior which led to the stop.

13

(Ross Depo. P. 9-10).  He further acknowledged the importance of maintaining this evidence. (Ross Depo. P. 10). Ross was unsure whether the two minute backup feature was on the camera equipment at the time of this event. (Ross Depo. P. 28).

50. Officer Golub further asserted that Hawkins was sweating profusely. (Arrest Aff.).

51. Officer Golub reported that he asked the driver for his identification at which point the driver, later identified as Hawkins, [stared] at the officer for approximately 1 minute, and then Hawkins got back in the car. (Arrest Aff.).  A review of the video makes it clear, that Officer Golub never asked Hawkins for identification while Hawkins was out the car. (Video).  The video conclusively depicts that Officer Golub first asked Hawkins for his license when Golub approached the car after Hawkins sat back down in the car.

52. Notwithstanding the affidavit in which Golub attested that Hawkins stared at him for approximately 1 minute after being asked for identification outside the car, when timed, the video makes clear that from the time Mr. Hawkins began to exit his vehicle until the time he follows Officer Golub's direction by compliantly sitting back in the car, less than 15 seconds passed. (Video). Notwithstanding the arrest affidavit where Officer Golub attested that he asked Mr. Hawkins while he was out of the car for his identification and Hawkins stared at him for one minute, the video/audio make clear that this did not occur. In fact, Officer Golub observed the backup lights of the vehicle on and thought that Hawkins had not put the car in park. (Video).  Golub states: "Put your car in

gear. Put your car in park." "Your reverse lights are on." "Have a seat in your car." (Video). As Mr. Hawkins sits in the car, Golub says: "Have a seat in the car close the door." As noted all of this occurred in less than 15 seconds. It is noted that Officer Golub's expert relies in part on the fact that Mr. Hawkins was "instructed to sit back in his car and did not respond, standing there and staring at Officer Golub." (Report of Edmonds). A review of the video makes clear that this did not occur.

53. Golub reported that he asked again for the identification and Hawkins fumbled with his wallet for several seconds before opening it up and handing Golub the license. (Arrest Aff.). A review of the video clearly depicts that within thirteen seconds of Officer Golub asking for Hawkins' license, Hawkins handed the license to Golub, at which point the officer asked for registration and insurance documents. (Video). Officer Golub attested that while he stood at the open window he could smell the "faint smell of burnt cannabis." (Arrest Aff.).

54. Golub reported that he asked Hawkins where he was going and explained to Hawkins the purpose of Golub's interaction with him. (Arrest Aff.). Notwithstanding the affidavit prepared by Officer Golub in which Golub attested that Mr. Hawkins was traveling at 5 mph on US 90, Officer Golub asserts on the video to Hawkins that the reason Golub stopped him was because he was driving 20 mph on US 90 and impeding the flow of traffic. (Video).

55. Golub reported that he had trouble understanding Hawkins because he spoke in a soft, mumbled tone. (Arrest Aff.) It is noted that on Mr. Hawkins can be heard on the video responding clearly to the officer's questions, indicating that he was

trying to go the speed limit; indicating that he opens the store early on Sunday; and that he had just woke up. (Video). Suspecting that Hawkins was driving under the influence, Officer Golub called for a backup unit and Officer Ross responded. (Arrest Aff.).

56. When Mr. Hawkins was asked to step out of his vehicle he was told to face the vehicle and was frisked. (Video).  It is noted that there is no articulation in any report compiled by the officers or any item in the materials presented to date that would indicated that this frisk was consistent with generally accepted policies, practices, training, or legal mandates with respect to frisking stopped individuals.  It is noted that by the time Hawkins was asked to step from the vehicle, Officer Ross was also on the scene. (Video).

57. All officers are trained that before conducting a frisk they must have articulable suspicion that the subject is armed and dangerous.  There is nothing in  any of the materials provided to date that would indicated that the frisk which occurred here was supported by articulable facts.

58. Mr. Hawkins was asked for the key to the door of the business and he immediately complied and provided the key to Officer Golub. (Video).  Officer Golub verified that the key fit the business. (Video).  After taking possession of the key and going to the door of the business, Golub returned and stated that he still did not understand why Hawkins was driving "20" miles per hour down the road. (Video).

59. Officer Ross testified that when he responded to assist Officer Golub he did not smell either alcohol or burnt cannabis on Mr. Hawkins or in his vehicle. (Ross

Depo. P. 13).  Officer Ross testified to his observation of cannabis as follows:
"From my training and experience, it appeared to be cannabis. And when I
attempted to retrieve it, it crumbled into even smaller pieces, which was, at that
point, unretrievable to even test." (Ross Depo. P. 26).  It is noted that officers in
this case suspect Mr. Hawkins of DUI and due to the lack of an odor of alcohol
believed it to be some other substance, the failure to capture even traces of
cannabis would be contrary to generally accepted policies, practices, and
training with respect to establishing the necessary elements of the criminal
conduct.

60. Ross testified that Mr. Hawkins pupils were dilated. (Ross Depo. P. 13).  It is
noted that in the alcohol report, Officer Golub reported that Mr. Hawkins' eyes
were contracted, the opposite of dilated. (Alc. Inf.  Report).    Officer Ross
described that Mr. Hawkins was polite and did what the officers had asked.
(Ross Depo. P. 14).  Officer Golub reported that Mr. Hawkins was confused.
(Alc. Inf. Report).

61. Officer Ross testified that the swaying he documented, approximately two
inches, was during the one legged stand. (Ross Depo. P. 17). Officer Golub
indicated that Mr. Hawkins was unsteady as he exited the vehicle; as he walked
to the roadside; and, as he was standing. (Alc. Inf. Report).  It is noted that none
of these observations are supported by the video. (Video).

62. Officer Golub then proceeded to standard field sobriety tests including the HGN
"Horizontal Gaze Nystagmus" which is where an officer looks for the smooth
pursuit of the eyes when following an object.   According to the affidavit Mr.

Hawkins, though indicating he understood the instructions kept his eyes straight ahead and did not follow the movement of the stimulus. (Arrest Aff.). On the video, Officer Golub, after starting the test tells Mr. Hawkins not to move his head when following the pen in a corrective tone and then says: "there you go" in a manner which would indicate that Hawkins was doing the test correctly. (Video). The HGN was conducted a second time. (Video). Golub then conducted the walk and turn test. It is noted that contrary to generally accepted policy, practice, and training this test was largely conducted outside the view of the camera. (Video). Officer Golub reported that Mr. Hawkins took 12 steps down the line but did not do them heel to toe as instructed and was unsteady and stepped of the line. (Arrest Aff.). Hawkins then turned around and took "9 steps back as instructed," however it was reported that Hawkins used a normal stride rather than heel to toe. (Arrest Aff.). Officer Ross reported that Hawkins did put one foot in front of the other however there was a 2 inch gap between his heel and toe. (Ross Report). Notwithstanding the fact that a great deal of the test was conducted outside the view of the camera, Hawkins' shadow can be seen on the building during most of the walk and turn and it is clear that he is walking with his heel in front of his toes, however it cannot be determined if there was a slight gap as described by Ross. (Video).

63. Officer Golub then conducted the one legged stand test. Golub reported that Hawkins was told to stop after he was observed being very unsteady, touching his heel to the ground, counting from one to ten and they counting four to ten twice. (Arrest Aff.). Officer Ross, who also reported on this test did not report

that Mr. Hawkins dropped his foot at any time during the test. (Ross Report). It is apparent from the video that Mr. Hawkins has difficulty counting, however notwithstanding the fact that one of the officers placed himself between the video and Mr. Hawkins, blocking the video documentation of the test, it appeared that Mr. Hawkins kept his leg off of the ground in a stable position for much longer than 30 seconds. (Video). It is noted that the purpose of making a recording by video of such a stop is to document the suspect's actions during the testing process. Performing tests outside the view of the camera and an officer placing themselves in a manner which blocks the view of the suspect during testing is contrary to generally accepted policies, practices and training with respect to the use of mobile video recorders during traffic and DUI stops.

64. Officer Golub acknowledged that he took Mr. Hawkins directly to the hospital for a blood test. (Golub Depo. P. 31). Officer Ross was asked if Florida law allowed an officer to ask consent for a blood test before obtaining a breath test to which he responded: "It's been a while since I've read complied consent. I honestly couldn't tell you…It's something that I don't -- one thing that I don't do a lot is DUIs, and that's something I would have to brush up on." (Ross Depo. P. 23). Since an officer is charged with making decisions as to what types of investigative actions are appropriate, it is essential that officers are aware of the actions they are allowed to take under the law.

65. Golub acknowledged that Mr. Hawkins indicated that he did not understand his rights, but when asked if he continued the questioning, Golub testified that he would have further explained the rights until they were understood. (Golub

Depo. P. 35). Golub acknowledged that there was nothing in his report to explain this further explanation, indicating that since there is no box for the further explanation on the report, he did not document it. (Golub Depo. P. 35). Golub asserted that notwithstanding the absence of any documentation of a further explanation of rights to Mr. Hawkins in the report, he had in fact provided this further explanation. (Golub Depo. P. 35-36). It is noted that officers are charged with scrupulously documenting that a suspect's rights have been honored. The failure to document, if a trier of fact were to determine that further explanation was in fact given by Golub, would be contrary to generally accepted policies, practices, training, and legal mandates with respect to documenting that rights were properly given and observed.

66. The results of forensic testing of Hawkins' blood specimen by FDLE determined that there was no alcohol or drugs in Hawkins' blood. (FDLE Lab Reports). While this report specifically avoids drawing conclusions of credibility, the lab report tested for, inter alia, cannabinoids, and found none in Hawkins' system. (FDLE Lab Report). The report is not consistent with the officer's report of smelling "burnt cannabis" in the vehicle where Hawkins was the sole occupant. If Mr. Hawkins had recently ingested cannabis then the test should have revealed that fact.

67. It is my opinion, based upon my specialized training, background, education, and experience as well as my continued research, authoring, auditing, consulting, and training on law enforcement practices nationwide that Officer

Golub lacked any basis for stopping Mr. Hawkins based upon the video evidence available in this case.

68. Officers throughout the United States are trained that there are two distinct justifications for depriving a citizen of liberty relating to the investigation of criminal activity. The first of these justifications is commonly referred to as a "Terry Stop" or investigative detention. Officers are trained that these stops do not require probable cause to believe the person has committed a crime, but rather are justified on a lesser degree of proof, specifically "reasonable suspicion."[1] In order to conduct a frisk of a person properly stopped the officer must also have separate reasonable suspicion based on articulable facts to believe the person is armed and dangerous.

69. The available video of Mr. Hawkins driving behavior depicts the vehicle being driven within its own lane of travel. (Video). There is no depiction of weaving. (Video). Following a U-turn using proper signals, Mr. Hawkins stops at a light which is clearly red. (Video). Once the light turns green, Hawkins starts proceeds nearly evenly with another vehicle in the lane next to him and does not sit at the light beyond normal driving behavior. (Video). Hawkins uses his turn signal to enter the lot of the business where he works. (Video). Additionally, it appears that he comes to a stop within the lines of one of the parking lot bays in front of the store. (Video). Simply stated there is nothing in the captured video, based upon my background, experience, education and training which would support a belief that Mr. Hawkins was impaired.

---

[1] See e.g. The Law Enforcement Officer's Pocket Manual 2008 Edition, Miles, Richardson, and Scudellari, Bureau of National Affairs 2008. P. 2:8; See also Quick Reference Legal Guide for Law Enforcement, Critical Legal Tasks in Law Enforcement 2008-2009, Jack Ryan, PATC Books, 2009 P. 10.

21

70. On the video Officer Golub asserted that he stopped Mr. Hawkins for traveling at 20 mph on US90. Golub's affidavit indicated that Mr. Hawkins was traveling 5 mph on US90. There is nothing in the materials to indicate that traveling 20 mph in the early morning hours with no traffic on the road would violate any traffic law and clearly Officer Golub did not indicate that he was stopping Hawkins to issue a citation/ticket for such violation. Golub also indicated that Hawkins made abrupt lane changes using his turn signal unnecessarily. Any reasonable and well trained officer would recognize that when changing lanes a driver should use their turn signal. There is no indication that Mr. Hawkins made an illegal U-turn. Thus, all of the driving behavior that Officer Golub used to support the stop would not support such a stop. Additionally when one reviews the portion of driving that is captured on the video it is clear that Mr. Hawkins is maintaining his lane of travel and driving in a manner which would not be viewed as indicating impairment.

71. It is my opinion, based upon my specialized training, background, education, and experience as well as my continued research, authoring, auditing, consulting, and training on law enforcement practices nationwide that Officer Golub's conclusion that Mr. Hawkins was impaired and thus should be subjected to a field sobriety test was inconsistent with generally accepted policies, practices, training, and legal mandates with respect to such tests.

72. At the outset, it is noted that if a fact-finder were to determine that Mr. Hawkins nearly fell when he got out of the car; was asked for his identification and stared at the officer for approximately a minute; was confused, and spoke in a manner

22

which could not be understood then there would be sufficient support to conduct the FST. Based on the foregoing paragraphs it is clear that the video is contrary to the assertions reported by Officer Golub.

73. It is my opinion, based upon my specialized training, background, education, and experience as well as my continued research, authoring, auditing, consulting, and training on law enforcement practices nationwide that the manner in which Officer Golub used the mobile video recording device was inconsistent with generally accepted policies, practices, training, and legal mandates with respect to the use of such devices.

74. It is well known in law enforcement that the purpose of recording stops is to document the conduct of the officers and the conduct of the subject(s) of the stop. This includes documentation of the conduct which led to the stop to begin with. Any reasonable and well trained officer would recognize that the recording of the stop is evidence as well as an official record of the department. Purposely failing to record portions of the audio would be contrary to all generally accepted policies, practices, training, and legal mandates with respect to the use of such equipment as well as the documentation of evidence.

75. Officer Golub acknowledged muting his body microphone at various points during the stop and arrest of Mr. Hawkins explaining: "Some things just didn't need to be on video or audio." (Golub Depo. P. 24). The very purpose of mobile video recording is to document the entire event. Officer Golub's explanation is contrary to all generally accepted policies, practices, training, and legal mandates with respect to such recording by law enforcement. Officer Golub

acknowledged that he has subsequently been trained or directed no to turn off his recording equipment. (Golub Depo. P. 26).

76. Officer Golub testified that when he left the City of Lake City Police Department he took all of his videos with him explaining that he had purchased the DVDs. (Golub Depo. P. 28). It is noted that videos of stops and arrests such as Mr. Hawkins are discoverable as they relate to pending criminal charges and the failure of a department to turn them over would violate discovery rules and, in some cases, the duty to disclose exculpatory evidence. The removal of the videos, recorded while functioning as an officer of the City of Lake City, is contrary to all generally accepted policies, practices, training, and legal mandates regarding the handling of evidence recorded by law enforcement. As also noted recordings such as these are also official records of the department and it is clearly inappropriate for an officer upon leaving a department to take official records with them.

77. It is my opinion, based upon my specialized training, background, education, and experience as well as my continued research, authoring, auditing, consulting, and training on law enforcement practices nationwide that Officer Golub's decision to arrest Mr. Hawkins was inconsistent with generally accepted policies, practices, training, and legal mandates with respect to arrest.

78. I hereby incorporate all of the foregoing facts and conclusions to this analysis of the arrest.

79. Officers throughout the United States are directed by policy and trained that the second justification for a deprivation of liberty of a citizen is when an officer has

24

probable cause to believe that the subject has committed a criminal offense.[2] Based on the video which included driving behavior as well as the interaction between the officers and Mr. Hawkins at the scene of the stop as well as all of the foregoing facts and conclusions cited, it  is my opinion that there was not sufficient facts and circumstances such that a reasonable and well trained officer would conclude that Mr. Hawkins was impaired.

80. It is my opinion, based upon my specialized training, background, education, and experience as well as my continued research, authoring, auditing, consulting, and training on law enforcement practices nationwide that the training of officers by the City of Lake City Police Department was not consistent with generally accepted policies, practices, and legal mandates with respect to proper training of law enforcement officers.

81. Officer Golub reported that he had been trained in the academy in field sobriety testing but acknowledged at the time of this event he had not been certified in field sobriety testing. (Golub Depo. P. 211-22).  In accord with the materials provided neither of the involved officer had on-going or specialized training in field sobriety testing, DUI, or DRE (Drug Recognition).

82. Chief Gilmore testified that she had decision making authority over training given to officers of the City of Lake City Police Department. (Gilmore Depo. P. 9).  Gilmore testified that there were training opportunities between courses at the academy and courses that were put out by the training supervisor that officers could go to if they wished to attend. (Gilmore Depo. P. 15-16).  The

---

[2] See e.g. The Law Enforcement Officer's Pocket Manual 2008 Edition, Miles, Richardson, and Scudellari, Bureau of National Affairs 2008. P. 4:2

chief could not answer whether any training was actually given to officers in the areas of 4th Amendment search and seizure, DUI detection, and dealing with people with mental impairments. (Gilmore Depo. P. 14-17).  The chief testified that the academy and vendors offered courses but she was unable to testify whether any officer was actually trained. (Gilmore Depo. P. 14-17).

83. Based on the Chief's testimony to date, it is clear that while the department may advertise training opportunities given by other entities, the department is not conducting training or requiring officers to attend trainings in these critical areas.

84. It is my opinion, based upon my specialized training, background, education, and experience as well as my continued research, authoring, auditing, consulting, and training on law enforcement practices nationwide that a policy or custom of the City of Lake City Police Department that allows resigning officers to remove videos taken by agency mobile video recording devices is contrary to all generally accepted policies, practices, training, and legal mandates with respect to the preservation of evidence as well as records retention.

85. Chief Gilmore testified that she could not testify to Lake City's policy on preserving evidence without looking at the policy and concluded: "We preserve based on policy." (Gilmore Depo. P. 17).

86. At this stage of my review I do not know if I may be asked to review additional documents.  Should I be asked to review any additional documents I will be

prepared to render additional opinions or supplement the opinions stated within this report.

87. At this point in the development of this case I do not know whether I will be using any demonstrative aids during my testimony.  Should I decide to use any such tool; I will assure that they are made available for review, if requested, prior to their use.

88. My fees for these professional services are outlined in the attached retainer agreement.

This report is signed under penalty of perjury on this 29th day of November 2013, in Greenville, Rhode Island.

*s/John J. Ryan*
John J. Ryan